UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -

DEUTSCHE BANK
AKTIENGESELLSCHAFT

- - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>DEFERRED PROSECUTION</u>
<u>AGREEMENT</u>

Cr. No. 20-00584 (RPK) (RML)

## <u>DEFERRED PROSECUTION AGREEMENT</u>

Defendant Deutsche Bank Aktiengesellschaft (the "Company"), pursuant to authority granted by the Company's Management Board reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and Money Laundering and Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Eastern District of New York (collectively, the "Offices") enter into this Deferred Prosecution Agreement (the "Agreement").

### <u>Criminal Information and Acceptance of Responsibility</u>

1.      The Company acknowledges and agrees that the Offices will file the attached two-count criminal Information in the United States District Court for the Eastern District of New York charging the Company with: (1) one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate: (a) the books and records provisions of the Foreign Corrupt Practices Act ("FCPA"), as amended, Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a); and (b) the internal controls provisions of the FCPA, as amended, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a); and (2) one count of conspiracy to commit wire fraud affecting a financial

institution, in violation of Title 18, United States Code, Section 1349. In so doing, the Company: (a) knowingly waives any right it may have to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached as Attachment A ("Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York. The Offices agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.     The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

2

**Term of the Agreement**

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term").  The Company agrees, however, that, in the event the Offices determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 23 to 25 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period.  Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.  If the Court refuses to grant exclusion of time under the Speedy Trial Act, Title 18, United States Code, Section 3161(h)(2), the Term shall be deemed to have not begun, and all the provisions of this Agreement shall be deemed null and void, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

**Relevant Considerations**

4.      The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

3

a.      the Company engaged in two separate and factually unrelated multiyear criminal schemes, namely, the FCPA scheme charged in Count One of the Information, which was investigated by the Offices, and the commodities trading scheme charged in Count Two of the Information, which was separately investigated by the Fraud Section.  For reasons of efficiency and convenience, the Offices and the Company have agreed to resolve both investigations at the same time in this case;

<u>The FCPA Case</u>

b.      the Company did not receive voluntary disclosure credit pursuant to the FCPA Corporate Enforcement Policy in the Department of Justice Manual 9-47.120, or pursuant to the Sentencing Guidelines, because it did not voluntarily and timely self-disclose to the Offices the FCPA conduct described in the Statement of Facts;

c.       the Company received full credit for its cooperation with the FCPA investigation conducted by the Offices, including making detailed factual presentations, providing regular updates on the Company's internal investigation, highlighting key facts and documents, making foreign-based employees available for interviews in the United States, and producing extensive documentation to the Offices, including documents located in foreign jurisdictions;

d.      the Company provided to the Offices all relevant facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Offices prior to the Agreement;

e.      the Company engaged in remedial measures, including: conducting a robust root cause analysis and taking substantial steps to remediate and address the misconduct, including significantly enhancing its internal accounting controls, its anti-bribery and anti-corruption program, and its Business Development Consultants ("BDCs") program on a global basis; making

4

a significant reduction in the number of BDCs used by the Company; imposing a requirement that the Anti-Fraud, Bribery and Corruption function ("AFBC") approve, and a member of the Management Board support, any new BDC arrangement; undertaking a review of BDCs on an annual basis with involvement by representatives of AFBC; instituting enhanced due diligence procedures and practices related to BDCs; and instituting enhanced anti-bribery training for employees. The Company also undertook employment actions based on the findings, which included disciplining and terminating certain employees;

      f.    the Company's 2015 Deferred Prosecution Agreement with the Fraud Section and the Department of Justice's Antitrust Division for criminal violations in connection with the Company's manipulation of the London Interbank Offered Rate ("LIBOR Resolution"), including the guilty plea of a Company subsidiary, and the imposition of an independent compliance monitorship in 2015, which is ongoing;

      g.    although the Company had inadequate anti-corruption controls and an inadequate anti-corruption compliance program during the period of the conduct described in the Statement of Facts, the Company has enhanced and has committed to continuing to enhance its anti-bribery and anti-corruption program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

      h.    based on the Company's remediation and the current state of its anti-corruption compliance program, the Company's agreement to report to the Offices as set forth in Attachment D to this Agreement (Corporate Compliance Reporting), and the Company's independent compliance monitor obligations in connection with the LIBOR Resolution, the Offices determined that an independent compliance monitor was unnecessary;

i. the nature and seriousness of the offense conduct, as described in the Statement of Facts, including making corrupt payments to BDCs, the willful falsification of books and records to conceal those improper payments, and the willful failure to implement an adequate system of internal controls;

j. the Company's contemporaneous parallel resolution with the U.S. Securities and Exchange Commission ("SEC") through a cease-and-desist proceeding relating to the corruption conduct described in the attached Statement of Facts, and the Company's agreement to pay $35,145,619 in disgorgement and prejudgment interest of $8,184,003;

k. the Company has agreed to continue to cooperate with the Offices in any ongoing investigation as described in Paragraph 5 below;

<u>The Commodities Trading Case</u>

l. the Company did not receive voluntary disclosure credit, because it did not voluntarily and timely self-disclose to the Fraud Section the commodities trading conduct described in the Statement of Facts;

m. the Company received full credit for its cooperation with the commodities trading investigation conducted by the Fraud Section, including producing extensive documentation in ways that did not implicate foreign data privacy laws;

n. the Company provided to the Fraud Section all relevant facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Fraud Section prior to the Agreement;

o. although negotiations to resolve the commodities trading investigation did not begin until late October 2020, the Company promptly accepted responsibility and agreed to resolve the investigation;

p.       all of the commodities trading conduct described in the Statement of Facts preceded the Company's 2015 Deferred Prosecution Agreement with the Fraud Section and the Department of Justice's Antitrust Division for criminal violations in connection with the LIBOR resolution, which also involved manipulative and deceptive trading practices, and the imposition of an independent compliance monitorship in 2015, which is ongoing;

q.       although the Company had inadequate commodities trading controls and an inadequate commodities trading compliance program during the period of the conduct described in the Statement of Facts, the Company has enhanced and has committed to continuing to enhance its commodities trading compliance program and internal controls under the independent compliance monitorship;

r.       the nature and seriousness of the offense conduct, as described in the Statement of Facts, including many instances of unlawful trading in precious metals futures contracts by five traders on three continents between approximately 2008 and 2013, resulting in at least $1,223,738 of loss to other futures market participants and significant harm to the integrity of core U.S. commodities markets;

s.       the Company's prior resolution with the U.S. Commodity Futures Trading Commission ("CFTC") on January 29, 2018, through a proceeding and order relating to the commodities trading conduct described in the attached Statement of Facts, and the Company's payment of a $30 million civil monetary penalty; and

t.       the Company has agreed to continue to cooperate with the Offices in any ongoing investigation as described in Paragraph 5 below;

u.       accordingly, after considering (a) through (t) above, the Offices believe that the appropriate resolution in this case is a Deferred Prosecution Agreement with the Company; a

7

criminal monetary penalty in the amount of $79,561,206 for the conduct related to violations of the FCPA accounting provisions, and a criminal monetary penalty in the amount of $5,625,000 for the conduct related to commodities trading in violation of the wire fraud statute, which both reflect a discount of twenty-five percent off the middle of the otherwise-applicable Sentencing Guidelines fine range, rather than a discount off the bottom of the fine range, to reflect the Company's prior similar misconduct; disgorgement of $681,480 and payment of $1,223,738 to compensate victims relating to the commodities trading conduct; and the Company's agreement to report to the Offices as set forth in Attachment D to this Agreement.

**Future Cooperation and Disclosure Requirements**

5.    The Company shall cooperate fully with the Offices in any and all matters relating to the conduct described in the Statement of Facts and other conduct under investigation by the Offices at any time during the Term, subject to applicable laws and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Offices, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its subsidiaries, or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Offices.  The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of

8

establishing the validity of any such assertion.  The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

a.       The Company shall truthfully disclose all factual information with respect to its activities, those of its subsidiaries, and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Offices may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Company.

b.       Upon request of the Offices, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.       The Company shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.   Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.       With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable laws and regulations, to other governmental

authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Offices, in their sole discretion, shall deem appropriate.

6.    In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Offices.

## Total Criminal Monetary Amount

7.    The Offices and the Company agree that the Total Criminal Monetary Amount to be paid by the Company pursuant to this Agreement is $87,091,424, which is comprised of the following components set forth below: (1) a criminal monetary penalty of $79,561,206 relating to the FCPA conduct, as well as a criminal monetary penalty of $5,625,000 relating to the commodities trading conduct; (2) a Criminal Disgorgement Amount of $681,480 relating to the commodities trading conduct; and (3) and payment of $1,223,738 to compensate victims of the commodities trading conduct for their losses as set forth in Paragraph 4(u) above (hereafter, the "Victim Compensation Amount").

8.    The Offices agree that the criminal monetary penalty of $5,625,000 relating to the commodities trading conduct is fully credited against the $30 million civil monetary penalty imposed on the Company by the CFTC in connection with the CFTC's January 29, 2018 proceeding and order.

## Payment of Criminal Monetary Penalty

9.    With respect to the FCPA conduct in the Statement of Facts, the Offices and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

10

a.      The November 1, 2018 version of the Sentencing Guidelines is applicable to this matter.

b.      <u>Offense Level</u>.  Based upon U.S.S.G. § 2B1.1, the total offense level is 30, calculated as follows:

| | | |
|---|---|---|
| § 2B1.1(a)(2) | Base Offense Level | 6 |
| § 2B1.1(b)(1)(L) | Value of Benefit Received (more than $25,000,000 but not more than $65,000,000) | +22 |
| § 2B1.1(b)(10)(B) | Conduct Occurred Outside of the United States | +2 |
| **TOTAL** | | **30** |

c.      <u>Base Fine</u>.  Based upon U.S.S.G. § 8C2.4(a)(2), the base fine is $35,360,536.

d.      <u>Culpability Score</u>.  Based upon U.S.S.G. § 8C2.5, the culpability score is 10, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | The organization had 5,000 or more employees and tolerance of the offense by substantial authority personnel was pervasive throughout the organization | +5 |
| (c)(2) | The organization committed part of the instant offense less than 5 years after a criminal adjudication based on similar misconduct | +2 |
| (g)(2) | The organization clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | **10** |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $35,360,536 |
| Multipliers | 2(min)/4(max) |

11

Fine Range                                    $70,721,072 / $141,442,144

The Company agrees to pay a total criminal monetary penalty in the amount of $79,561,206 (the "Total Criminal Monetary Penalty"). This reflects a twenty-five percent discount off the middle of the applicable Sentencing Guidelines fine range. The Total Criminal Monetary Penalty will be paid to the United States Treasury within ten business days of the execution of this Agreement, of which $20,000,000 will be paid to the United States Postal Inspection Service Consumer Fraud Fund. The Company and the Offices agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement. The Total Criminal Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that the Total Criminal Monetary Penalty is the maximum penalty that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those circumstances, they will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Monetary Penalty. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

10.     With respect to the commodities trading conduct in the Statement of Facts, the Offices and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.     The November 1, 2018 version of the Sentencing Guidelines is applicable to this matter.[1]

b.     <u>Offense Level</u>.  Based upon U.S.S.G. § 2B1.1, the total offense level is 25, calculated as follows:

| (a)(1) | Base Offense Level | 7 |
|---|---|---|
| (b)(1)(H) | Loss of More Than $550,000 | +14 |
| (b)(2)(A)(i) | More Than 10 Victims | +2 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | **25** |

c.     <u>Base Fine</u>.  Based upon U.S.S.G. § 8C2.4(a)(1), the base fine is $5,000,000 (the fine indicated in the Offense Level Fine Table)

d.     <u>Culpability Score</u>.  Based upon U.S.S.G. § 8C2.5, the culpability score is 5, calculated as follows:

| (a) | Base Culpability Score | 5 |
|---|---|---|
| (b)(4) | The relevant unit had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense | +2 |
| (g)(2) | The organization cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |

---

[1] Application of the version of the Sentencing Guidelines that was in effect at the time of the commodities trading conduct described in the Statement of Facts would result in a higher total offense level and base fine amount.  <u>See</u> U.S.S.G. § 1B1.11.

| **TOTAL** | **5** |

Calculation of Fine Range:

| Base Fine | $5,000,000 |
| Multipliers (U.S.S.G. § 8C2.6) | 1(min)/2(max) |
| Fine Range | $5,000,000 / $10,000,000 |

The Offices have determined that a criminal monetary penalty in the amount of $5,625,000 (the "Commodities Criminal Monetary Penalty") is appropriate as to the commodities trading conduct. The Commodities Criminal Monetary Penalty reflects a twenty-five percent discount off the middle of the applicable Sentencing Guidelines fine range. However, as noted above, the Offices are fully crediting the Commodities Criminal Monetary Penalty against the $30 million civil monetary penalty imposed by the CFTC in connection with its January 29, 2018 proceeding and order.

**Payment of Criminal Disgorgement Amount**

11.     The Company hereby agrees to disgorge to the United States the sum of $681,480 (the "Criminal Disgorgement Amount"). The Criminal Disgorgement Amount has been calculated by the Offices based on the unlawful trading profits for the commodities trading conduct described in the Statement of Facts. The Company shall pay the Criminal Disgorgement Amount no later than ten (10) business days after the Agreement is fully executed, pursuant to payment instructions provided by the Offices in their sole discretion.

12.     The Criminal Disgorgement Amount paid is final and shall not be refunded should the Offices later determine that the Company has breached this Agreement and commence a prosecution against the Company. In the event of a breach of this Agreement and subsequent prosecution, the Offices may pursue additional civil and criminal forfeiture in excess of the

Criminal Disgorgement Amount.  The Offices agree that in the event of a subsequent breach and prosecution, they will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever forfeiture the Court shall impose as part of its judgment.  The Company understands that such a recommendation will not be binding on the Court.

### Payment of Victim Compensation Amount

13.     The Company agrees to pay the Victim Compensation Amount, which is $1,223,738.  The Company shall establish an escrow account and deposit the full Victim Compensation Amount into the escrow account no later than ten (10) business days after the Agreement is signed.

14.     The Company agrees to disburse victim compensation payments from the escrow account directly to identified victims according to instructions provided by the Fraud Section in the Fraud Section's sole discretion.

15.     The Company agrees that any part of the Victim Compensation Amount that remains unclaimed twelve (12) months after the execution of this Agreement shall revert to the United States in the form of an additional criminal monetary penalty, and to pay such additional criminal monetary payment to the United States pursuant to payment instructions provided by the Fraud Section in its sole discretion.

### Conditional Release from Liability

16.     Subject to Paragraphs 23 to 25, the Offices agree, except as provided in this Agreement, that they will not bring any criminal or civil case against the Company or any of its branches, representative offices or direct or indirect affiliates, or joint ventures relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to this Agreement.  The Offices, however, may use any information related to the conduct described in

the Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

       a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

       b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

**Corporate Compliance Program**

17.      The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, subsidiaries, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C. In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures, regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records,

and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C.

## Corporate Compliance Reporting

18.     The Company agrees that it will report to the Offices annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C.  These reports will be prepared in accordance with Attachment D.

## Deferred Prosecution

19.     In consideration of the undertakings agreed to by the Company herein, the Offices agree that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Company that is not set forth in the Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

20.     The Offices further agree that if the Company fully complies with all of its obligations under this Agreement, the Offices will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within six months after the Agreement's expiration, the Offices shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts.  If, however, the Offices determine during this six-month period that the Company breached the Agreement during the Term, as described in Paragraph 23,

the Office's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 23 to 25, remains in full effect.

### Breach of the Agreement

21.     If, during the Term, the Company (a) commits any felony under United States federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 18 and 19 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Offices in the United States District Court for the Eastern District of New York or any other appropriate venue.  Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Offices' sole discretion.  Any such prosecution may be premised on information provided by the Company or its personnel.  Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by

18

signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

22.     In the event the Offices determine that the Company has breached this Agreement, the Offices agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Company.

23.     In the event the Offices determine that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Offices or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this

Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Offices.

24.     The Company acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.   The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

25.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Offices, in the form of executing the document attached as Attachment E to this Agreement, that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

### Sale, Merger, or Other Change in Corporate Form of Company

26.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates

involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Office's ability to determine a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 23 to 25 of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

## Public Statements by Company

27.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility

by the Company set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 23 to 25 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Offices shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

28.     The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Company; and (b) whether the Offices have any objection to the release.

29.     The Offices agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct

underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Offices are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

30.     This Agreement is binding on the Company and the Offices but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Offices will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

## Notice

31.     Any notice to the Offices under this Agreement shall be given by electronic mail ("e-mail") and/or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave. NW, 11th Floor, Washington, D.C. 20005, Chief, MIMF Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave. NW, 3rd Floor, Washington, D.C. 20005, Chief, Bank Integrity Unit, Money Laundering and Asset Recovery Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave. NW, Ste. 10100, Washington, D.C. 20530, and Chief, Criminal Division, United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201. Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Joe Salama,

General Counsel – Americas and Global Head of Litigation and Regulatory Enforcement, Deutsche Bank AG, New York Branch, 60 Wall Street, New York, New York, 10005-2836, and Richard W. Grime, Gibson, Dunn & Crutcher LLP, 1050 Connecticut Avenue NW, Washington, DC 20036-5306, or by electronic mail to those individuals or to other counsel or individuals identified to the Offices by the Company. Notice shall be effective upon actual receipt by the Offices or the Company.

## **Complete Agreement**

32.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Offices. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**
**FOR DEUTSCHE BANK AKTIENGESELLSCHAFT:**

Date: Jan. 7, 2021                    By: _____

Joe Salama
General Counsel – Americas and
Global Head of Litigation and
Regulatory Enforcement
Deutsche Bank Aktiengesellschaft

Date: 1/7/21                    By: _____

Andrew Stemmer
Head of Litigation and Regulatory
Enforcement – Americas
Deutsche Bank Aktiengesellschaft

Date: 1/7/21                    By: _____

Richard W. Grime
Lora E. MacDonald
Gibson, Dunn & Crutcher LLP

24

**FOR THE DEPARTMENT OF JUSTICE:**

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: January 7, 2021                    By: _____

Katherine Nielsen, Trial Attorney

By: _____

Brian Young, Deputy Chief
Avi Perry, Assistant Chief
Leslie S. Garthwaite, Trial Attorney

DEBORAH L. CONNOR
Chief, Money Laundering & Asset
Recovery Section
Criminal Division
United States Department of Justice

Date: January 7, 2021                    By: _____

Elizabeth Boison
Nikhila Raj
Trial Attorneys

SETH D. DUCHARME
Acting United States Attorney
Eastern District of New York

Date: January 7, 2021                    By: _____

Alixandra Smith
Assistant United States Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Deutsche Bank Aktiengesellschaft (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Management Board of the Company. I have advised and caused outside counsel for the Company to advise the Management Board fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel – Americas and Global Head of Litigation and Regulatory Enforcement for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: Jan. 7, 2021

Deutsche Bank Aktiengesellschaft

By: _____

Joe Salama
General Counsel – Americas and
Global Head of Litigation and
Regulatory Enforcement

## CERTIFICATE OF COUNSEL

I am counsel for Deutsche Bank Aktiengesellschaft (the "Company") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Management Board. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.  Further, I have carefully reviewed the terms of this Agreement with the Management Board and the General Counsel of the Company.  I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Management Board, is an informed and voluntary one.

Date: 1/7/21

By: _____
RICHARD W. GRIME
GIBSON, DUNN & CRUTCHER LLP
Counsel for Deutsche Bank Aktiengesellschaft

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and Money Laundering and Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Eastern District of New York (collectively, the "Offices") and Deutsche Bank Aktiengesellschaft ("Deutsche Bank AG" or the "Company"). The Company hereby agrees and stipulates that the following information is true and accurate. The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Offices pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

## I.     THE FCPA SCHEME

### The Defendant and Other Relevant Entities

1. From in or about and between 2009 and at least 2016 (the "Relevant FCPA Period"), Deutsche Bank AG was a global investment bank and financial services company headquartered in Frankfurt, Germany. Deutsche Bank AG operated globally through subsidiaries, branches and affiliates (collectively with Deutsche Bank AG, "Deutsche Bank"),[1] and it employed

---

[1] Where Deutsche Bank AG and its subsidiaries, multiple subsidiaries, or employees from multiple Deutsche Bank AG entities are discussed herein, "Deutsche Bank" is used to describe the actors.

1

during that time approximately 100,000 employees and agents in 62 countries. At all relevant times, Deutsche Bank AG had shares of stock traded on the New York Stock Exchange and was required to file periodic reports with the U.S. Securities and Exchange Commission ("SEC") pursuant to Section 15(d) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78o(d). Accordingly, during the Relevant FCPA Period, Deutsche Bank AG was an "issuer" as that term is used in the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1 and 78m(b).

### Overview of the Criminal FCPA Scheme

2.      During the Relevant FCPA Period, Deutsche Bank contracted with third-party intermediaries, which it called "Business Development Consultants" or "BDCs," to obtain and retain business globally. The BDCs were approved by then-high-level Deutsche Bank management and various regional committees.

*False Books and Records*

3.      Beginning in or about at least 2009 through in or about at least 2016, Deutsche Bank AG, acting through its employees and agents, knowingly and willfully conspired and agreed with others to maintain false books, records, and accounts that did not accurately and fairly reflect the transactions and dispositions of Deutsche Bank AG's assets, by, among other things, (1) falsely concealing bribes paid to a client's decisionmaker in Saudi Arabia to retain that client's business by recording the payments as "referral fees" paid to a BDC; and (2) falsely concealing millions of dollars of payments made to an intermediary acting as a proxy for a foreign official in Abu Dhabi by recording the payments as "consultancy" payments to a BDC.

*Failure to Implement and Maintain Internal Accounting Controls*

4.      During the Relevant FCPA Period, Deutsche Bank AG, acting through its employees and agents, knowingly and willfully failed to implement and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the execution of transactions in accordance with management's authorization, and which would have helped detect and stop Deutsche Bank from continuing to make corrupt payments to and through BDCs.

5.      As further detailed herein, Deutsche Bank AG, acting through its employees and agents, knowingly and willfully conspired and agreed with others to fail to implement and maintain sufficient internal accounting controls related to payments to BDCs, including by, among other things, failing to conduct meaningful due diligence regarding BDCs, making payments to certain BDCs who were not under contract with Deutsche Bank AG at the time, and making payments to certain BDCs without invoices or adequate documentation of the services purportedly performed.  Certain Deutsche Bank AG employees and agents also created, and helped BDCs to create, false justifications and documentation necessary for payment approval.

6.      During the Relevant FCPA Period and as a result of the above-described FCPA scheme, Deutsche Bank AG made approximately $35,360,536 in profits from transactions related to three specific BDCs detailed further herein.

**Deutsche Bank AG's Failure to Implement Adequate Controls in Response to Red Flags Related to BDCs**

7.      In or about 2009, a group within Deutsche Bank AG's internal audit function conducted a targeted review of "business arrangements that could be associated with corruption" in Deutsche Bank's Corporate Finance operations in the Asia-Pacific region.  In 2009,

the internal audit group issued a report identifying "risk indicators" and highlighting concerns with Deutsche Bank's use of, and payments to, BDCs, including lack of oversight to ensure BDCs were not used for corrupt purposes and lack of documentation supporting the actual services rendered. The report made numerous recommendations regarding the use and payment of BDCs and recommended that Deutsche Bank AG's global BDC policy be updated accordingly. The report was distributed to high-level management at Deutsche Bank AG, including members of Deutsche Bank AG's Management Board. However, Deutsche Bank AG failed to implement additional controls sufficient to address the issues identified in the report.

8.      In or about 2011, the internal audit group conducted another internal review of BDC relationships at Deutsche Bank as part of the Deutsche Bank AG's global anti-corruption program and identified numerous ongoing control failures regarding BDCs. It found, among other things: deficiencies in the due diligence conducted by Deutsche Bank employees on BDCs; failure by Deutsche Bank to appropriately document, mitigate, and manage anti-corruption risks associated with multiple BDCs; and failure by Deutsche Bank to document the proportionality of, and justifications for, payments to BDCs. The internal audit group's 2011 report, which was also distributed to high-level management at Deutsche Bank AG including members of Deutsche Bank AG's Management Board, made additional recommendations for internal controls improvements in the BDC program. Nevertheless, Deutsche Bank continued to approve engagements of, and payments to, BDCs without implementing additional controls.

### Falsification of Records and Failures to Implement Controls in Connection with Corrupt Payments in Abu Dhabi

9. In or about 2010, Deutsche Bank contracted with a BDC based in Abu Dhabi ("the Abu Dhabi BDC")[2] to obtain business with an investment vehicle indirectly owned by the government of Abu Dhabi ("the Abu Dhabi SOE"). The deal was known internally at Deutsche Bank AG as "Project X."

10. Prior to entering into a contractual relationship with the Abu Dhabi BDC, certain Deutsche Bank AG bankers, including at least four Managing Directors of Deutsche Bank AG who also held high-level regional and functional positions at Deutsche Bank, knew that: (1) the Abu Dhabi BDC was a relative of a high-ranking official of, and a decision-maker for, the Abu Dhabi SOE and its parent entity ("the Abu Dhabi SOE Official"); (2) the Abu Dhabi BDC was acting as a proxy for the Abu Dhabi SOE Official; and (3) paying BDC fees to the Abu Dhabi BDC was a requirement for Deutsche Bank to obtain the Project X business from the Abu Dhabi SOE.

11. For example, on or about April 24, 2010, an executive of Deutsche Bank, who was also a Managing Director of Deutsche Bank AG ("Deutsche Bank AG Managing Director 1"), emailed a regional Deutsche Bank executive, who was also a Managing Director of Deutsche Bank AG, explaining that "[the Abu Dhabi BDC] confirms he is behind [the Abu Dhabi SOE Official]."

---

[2] The identity of the Abu Dhabi BDC and all other anonymized entities, individuals and projects discussed herein are known to the Company and the Offices.

5

12.     Similarly, in a meeting report dated on or about March 11, 2010, another Deutsche Bank AG Managing Director sent an email to Deutsche Bank AG Managing Director 1 stating that the Abu Dhabi BDC "really is the gate keeper to [the Abu Dhabi SOE Official]."

13.     Deutsche Bank AG Managing Director 1 also made it clear to others at Deutsche Bank that approving the Abu Dhabi BDC's contract was necessary to close the deal for Project X.

14.     For example, on or about May 18, 2010, Deutsche Bank AG Managing Director 1 emailed another Deutsche Bank AG Managing Director, who was the head of a regional business line, stating, "We need to close the [Abu Dhabi BDC] angle within the next 48hrs. Need ur [*sic*] leadership and influence on getting it thru GMRAC."

15.     The Abu Dhabi BDC's engagement was considered and approved by the Global Markets Risk Assessment Committee ("GMRAC"), which included high-ranking Deutsche Bank employees from multiple Deutsche Bank AG subsidiaries and divisions, including a high-ranking employee in Deutsche Bank's regional Legal and Compliance function.  Documentation reflecting the GMRAC process shows that committee members approved the BDC relationship despite indicia of corruption related to the engagement of the Abu Dhabi BDC, including: (1) the Abu Dhabi BDC's relationship to government officials; (2) the Abu Dhabi BDC's lack of qualifications to serve as a BDC; (3) the indirect involvement of another intermediary (the "Abu Dhabi Intermediary"), who was a relative of the Abu Dhabi BDC and business partner of the Abu Dhabi SOE Official, and who had roles with several state-owned entities, including the parent company of the Abu Dhabi SOE; and (4) the fact that the Abu Dhabi SOE Official was also pressuring Deutsche Bank to finance a yacht in which the Abu Dhabi SOE Official had an

ownership interest (the "Yacht") in exchange for winning additional business from the Abu Dhabi SOE.

16.     Internal Deutsche Bank email communications show that close in time to the GMRAC meetings about the Abu Dhabi BDC, the Abu Dhabi SOE Official pressed Deutsche Bank to provide financing for the Yacht.

17.     For example, on or about May 17, 2010, a subordinate of the Abu Dhabi SOE Official sent an email to a Deutsche Bank AG Managing Director, copying the Abu Dhabi SOE Official, which was then forwarded to Deutsche Bank AG Managing Director 1 and others at Deutsche Bank.  The email stated, "[Abu Dhabi SOE Official] has asked me to get in touch with DB: reputationally, this financing is regarded as absolutely crucial, and [the Abu Dhabi SOE Official] made the point very forcefully that those institutions which participate in it can expect in future to enjoy 'most favoured status' with . . . [the Abu Dhabi SOE]."  This email was sent approximately two weeks before the GMRAC met to approve the Abu Dhabi BDC.

18.     Deutsche Bank ultimately provided financing for the Yacht.

19.     Deutsche Bank executed the BDC contract with the Abu Dhabi BDC on or about June 3, 2010.  Seven days after Deutsche Bank signed the BDC contract with the Abu Dhabi BDC, Deutsche Bank received the business from the Abu Dhabi SOE for Project X.

20.     On or about July 22, 2010, within weeks of receiving the business, Deutsche Bank amended the Abu Dhabi BDC's contract to increase the payment under the contract and to include an ongoing monthly retainer of €85,000, without referencing any additional services that the Abu Dhabi BDC would provide.

21.     On or about July 26, 2010, Deutsche Bank corruptly paid the Abu Dhabi BDC €1.585 million, comprised of a €1.5 million success fee for Project X and the first monthly retainer, which it falsely recorded in Deutsche Bank's books as a "consultancy charge."

22.     Deutsche Bank did not conduct due diligence on the Abu Dhabi BDC before executing the contract with the Abu Dhabi BDC and beginning to pay fees thereunder.  Deutsche Bank even failed to document the Abu Dhabi BDC's full name and biographical information.  In total, Deutsche Bank corruptly paid the Abu Dhabi BDC approximately $3,464,650 without any invoices and with minimal evidence of services provided, and caused those payments to be falsely recorded in Deutsche Bank AG's books, records, and accounts.

### Falsification of Records and Failures to Implement Controls in Connection with Corrupt Payments in Saudi Arabia

23.     In or about 2011, Deutsche Bank AG entered into a BDC contract with a special purpose vehicle ("SPV") beneficially owned by the wife of an individual who was responsible for managing the family office and the personal investments ("the Family Office") of a Saudi official ("the Family Office Manager").  The business was managed out of a European Deutsche Bank subsidiary.  Under the terms of the contract, the SPV owned by the Family Office Manager's wife ("the Saudi BDC") would be paid fees that were falsely recorded in the Company's books as "referral fees," when the true purpose was for Deutsche Bank to make corrupt payments to the Family Office Manager in order for Deutsche Bank to retain the business of the Family Office.

24.     The Family Office Manager made investment decisions for the Family Office and, during the Relevant FCPA Period, Deutsche Bank AG managed hundreds of millions of dollars in investments for the Family Office.  Deutsche Bank AG contracted with the Saudi

8

BDC to facilitate and conceal corrupt payments from Deutsche Bank AG to the Family Office Manager, because Deutsche Bank bankers believed that the Family Office Manager would take the Saudi official's business to another bank if it did not pay bribes to the Family Office Manager.

25. Prior to entering into a contractual relationship with the Saudi BDC, certain Deutsche Bank AG bankers, including at least four Managing Directors of Deutsche Bank AG and several high-level employees and officers of Deutsche Bank AG and Deutsche Bank's European subsidiary, knew that the Saudi BDC was the wife of the Family Office Manager and that the purpose of engaging the Saudi BDC was to corruptly provide bribe payments to the Family Office Manager in order to retain the business of the Family Office.

26. To facilitate corrupt payments to the Family Office Manager through the Saudi BDC, Deutsche Bank helped the Saudi BDC establish a shell company in the British Virgin Islands ("the BVI Company") and opened an account for the BVI Company at Deutsche Bank into which Deutsche Bank AG made payments to the Saudi BDC.

27. On or about May 3, 2011, a Deutsche Bank Director, who was also the regional head of sales and business management ("Deutsche Bank Director 1"), emailed Deutsche Bank AG Managing Directors, including a high-level executive of Deutsche Bank's European subsidiary, seeking support and approval for the arrangement because "[the Saudi BDC's] husband [was] a Director of the [] client," creating an economic connection between the client and the "paid [Saudi BDC]."

28. To conceal the corrupt nature of the agreement with the Saudi BDC, Deutsche Bank Director 1 falsely portrayed the Saudi BDC as the source of the business with the Family Office in documentation provided to Deutsche Bank AG. Deutsche Bank Director 1 and other Deutsche Bank employees knew that the Saudi BDC was not the source of the business,

because a Deutsche Bank AG Managing Director and regional business manager ("Deutsche Bank AG Managing Director 2") had a pre-existing relationship with the Family Office from his previous employment at another bank, and he brought the Family Office client with him to Deutsche Bank AG in or about 2010, months before he insisted that the Saudi BDC was the "finder" and source of the business. Deutsche Bank bankers were aware that the Family Office Manager and the Saudi BDC had received "finder's fees" from this other bank, and that they would expect the same from Deutsche Bank.

29.    Because the Saudi BDC arrangement involved Deutsche Bank AG, Deutsche Bank's European subsidiary, and the establishment of a new client account at Deutsche Bank for the BVI Company, multiple senior officers of Deutsche Bank considered and approved the Saudi BDC's consulting engagement. This approval chain for the Saudi BDC included a senior executive of Deutsche Bank's European subsidiary and a regional wealth management executive. Each of these individuals approved the Saudi BDC relationship despite understanding the corrupt purpose of the engagement. The Deutsche Bank European subsidiary senior executive cited "the high value of the client" as justification for paying the Saudi BDC.

30.    Deutsche Bank AG made four payments to the Saudi BDC, which Deutsche Bank AG deposited into the BVI Company's account held at Deutsche Bank. The first payment was falsely described as an "exceptional payment" of $150,000 that was cleared through New York, New York on or about December 22, 2011. The Saudi BDC was not entitled to this payment under the terms of the BDC contract with Deutsche Bank AG. However, an email among Deutsche Bank bankers, including Deutsche Bank Director 1, Deutsche Bank AG Managing Director 2, a Deutsche Bank AG Managing Director and regional Private Wealth Management officer ("Deutsche Bank AG Managing Director 3"), and another Deutsche Bank AG Managing Director

who was a regional Private Wealth Management officer ("Deutsche Bank AG Managing Director 4"), explained that this exceptional payment would "provide [Deutsche Bank AG Managing Director 2] with additional influence to persuade the client to upsell/invest existing large cash balances."  In another email regarding this payment, Deutsche Bank AG Managing Director 2 stated that he needed to make the payment to "incentivise" the Family Office Manager, and further urged approval of the "exceptional" payment, stating, "Money paid to [the Family Office Manager] will remain in an SPV opened for that purpose with us."  Deutsche Bank Managing Director 4 approved the "exceptional payment," which was in fact a bribe to the Family Office Manager.

31.    Deutsche Bank AG made two payments pursuant to the BDC contract with the Saudi BDC: $220,738 in or about February 2012 and €340,000 in or about December 2012. The February 2012 payment cleared through New York, New York, and passed through the Eastern District of New York.  These payments were falsely recorded as referral fees for the introduction of a new client—the Family Office—under the contract.  However, the Deutsche Bank bankers, including Deutsche Bank AG Managing Director 2 and others, knew that the Saudi BDC did not introduce the Family Office to Deutsche Bank AG, that the Family Office was not a new client, and that the payments to the Saudi BDC were in fact bribes paid to the Family Office Manager to retain the Family Office business.

32.    Deutsche Bank AG also made a payment falsely recorded as a "goodwill payment" to the Saudi BDC that was not authorized by the BDC contract.  In or about December 2012, in response to the Family Office Manager's complaints about the amount of money he personally was receiving under the Saudi BDC's contract, Deutsche Bank AG made a second exceptional payment to the Saudi BDC of €220,000.  In an email advocating for this payment, sent on or about November 30, 2012, Deutsche Bank Director 1 stated, "[Deutsche Bank's] single

11

largest relationship [in the region] . . . is at risk" and there was the "serious potential of the client withdrawing and closing his relationship" if the payment were not made.  To appease the Family Office Manager, and to retain the Family Office's business, Deutsche Bank AG made the corrupt payment and falsely recorded it as a "goodwill payment."

33.     After the "goodwill payment," Deutsche Bank Director 1 and other Deutsche Bank bankers continued to push for additional payments to the Saudi BDC.  For example, Deutsche Bank Director 1 sent an email on or about August 30, 2013 cautioning that "client and [the Saudi BDC] are intimately linked and . . . any cessation of payment to the [the Saudi BDC] will certainly prompt a significant outflow of assets" from the Family Office.  The BDC contract with the Saudi BDC was terminated in or about March 2016.

34.     Because Deutsche Bank helped set up the BVI Company and managed the account into which payments were made by Deutsche Bank, Deutsche Bank was also aware that payments to the BVI Company were ultimately transferred from that account to the Family Office Manager, and employees and agents of Deutsche Bank AG knew that fees paid to the Saudi BDC were bribes that were falsely recorded in Deutsche Bank AG's books and records.

35.     In addition to the four payments made to the Saudi BDC via the BVI Company, Deutsche Bank also provided the Family Office Manager with additional benefits in order to retain Family Office business, including a loan of approximately €635,000 to purchase a house in France.

36.     Between in or about 2011 and 2012, Deutsche Bank corruptly paid the Saudi BDC a total of approximately $1,087,538 and caused those payments to be falsely recorded in the Company's books, records and accounts.

**Further Falsification of Records and Failures to Implement Controls**

37.     Between in or about February 2007 and February 2016, Deutsche Bank maintained a BDC relationship with a regional tax judge ("the Italian BDC") to bring clients to Deutsche Bank.

38.     Email communications and other documents exchanged between Deutsche Bank employees around the time of the Italian BDC's onboarding indicated clearly that the Italian BDC was a tax judge.

39.     Furthermore, invoices and records of payments to the Italian BDC throughout his engagement were known by certain Deutsche Bank AG Managing Directors and Deutsche Bank employees to be false, including because certain employees assisted in the falsification of documents, and Deutsche Bank made payments to the Italian BDC outside of the terms of his BDC contracts.  For example:

a.      Under the Italian BDC's 2008 and later contracts, the Italian BDC was to be paid twice a year by Deutsche Bank.  But records show that he was in fact paid more often than twice a year, received multiple payments for the same services, and sometimes received payments for no services at all.  The Italian BDC was also paid at a higher commission rate than his contracts allowed;

b.      When one of the Italian BDC's 2010 invoices was challenged for lack of supporting services, the Italian BDC's business sponsor, who was a Deutsche Bank Director ("Deutsche Bank Director 2"), falsely linked the introduction of three accounts for Deutsche Bank clients to the Italian BDC;

c.      In or about 2011, Deutsche Bank continued to pay the Italian BDC for services, even though his contract had not been renewed for that year;

13

       d.      Between in or about 2012 and 2013, when the Italian BDC demanded more money than he was entitled to under his contract, Deutsche Bank Director 2 and other Deutsche Bank employees agreed that they would "find another agreement/job to sign and he can then invoice us" for the amounts he requested for those services. Deutsche Bank Director 2 and other Deutsche Bank bankers ultimately agreed that the Italian BDC would submit some training materials or an advisory report to justify the demanded payment. While the Italian BDC provided some research materials to Deutsche Bank, email communications involving Deutsche Bank Director 2, other Deutsche Bank employees, and the Italian BDC make it clear that this payment was not for the materials submitted, but to comply with the Italian BDC's demand for more fees than he was entitled to under the BDC contract; and

       e.      In or about 2014, the Italian BDC demanded €75,000 for introducing a client to a Deutsche Bank entity not covered by his BDC contract. A high-ranking officer of Deutsche Bank, who was a Deutsche Bank AG Director, proposed justifying the payment by linking it to another Deutsche Bank project unrelated to the Italian BDC. In response, the Italian BDC suggested that he invoice Deutsche Bank for additional "reports." Deutsche Bank ultimately made a one-time payment of €75,000 to the Italian BDC to satisfy this demand, which was entirely outside of the BDC agreement and was falsely recorded in Deutsche Bank AG's books and records.

       40.      On or about February 23, 2016, Deutsche Bank made a payment to the Italian BDC of approximately $39,185 that was falsely recorded in Deutsche Bank's books and records.

       41.      Deutsche Bank paid the Italian BDC a total of approximately $864,450 between in or about 2007 and 2016.

## II.      THE COMMODITIES FRAUD SCHEME

### The Defendant and Other Relevant Individuals

42.     From in or about and between 2008 and 2013 (the "Relevant Commodities Fraud Period"), Deutsche Bank AG, together with its subsidiaries and affiliates, operated global commodities trading businesses that included the trading of precious metals futures contracts and related products. During the Relevant Commodities Fraud Period and continuing today, the Company was and remains a financial institution within the definition of Title 18, United States Code, Section 20.

43.     James Vorley worked at the Company from in or about and between May 2007 and March 2015 and, in that capacity, Vorley traded precious metals futures contracts. Vorley was based in London.

44.     Cedric Chanu worked at the Company from in or about and between March 2008 and December 2013 and, in that capacity, Chanu traded precious metals futures contracts. From in or about and between March 2008 and May 2011, Chanu was based in London, and from in or about and between May 2011 and December 2013, Chanu was based in Singapore.

45.     David Liew worked at the Company from in or about and between July 2009 and February 2012 and, in that capacity, Liew traded precious metals futures contracts.  Liew was based in Singapore.

46.     Edward Bases worked at the Company from in or about and between July 2008 and June 2010 and, in that capacity, Bases traded precious metals futures contracts.  Bases was based in New York.

47.    Trader 1 worked at the Company from in or about and between April 1998 and December 2015 and, in that capacity, Trader 1 traded precious metals futures contracts.  Trader 1 was based in New York.

**Market Overview and Definitions**

48.    A "futures contract" was a type of legally binding contract to buy or sell a particular product or financial instrument at an agreed-upon price and on an agreed-upon date in the future.  When the parties to the futures contract (namely, the buyer and the seller) entered into their agreement, the buyer agreed to pay for, and the seller agreed to provide, a particular product or financial instrument at the agreed-upon price on the agreed-upon date in the future.  Futures contracts were traded on markets designated and regulated by the United States Commodity Futures Trading Commission ("CFTC").

49.    The CME Group Inc. ("CME Group") was a commodities marketplace made up of several exchanges, including the Commodity Exchange, Inc. ("COMEX") and the New York Mercantile Exchange, Inc. ("NYMEX").  Each of COMEX and NYMEX was a "registered entity" with the CFTC.

50.    "Globex" was an electronic trading system used by COMEX and NYMEX, which allowed market participants to trade futures contracts from anywhere in the world.  The CME Group operated Globex using computer servers located in Chicago and Aurora, Illinois.

51.    Precious metals futures contracts included gold, silver, platinum, and palladium futures contracts, which were contracts for the delivery of gold, silver, platinum, and palladium, respectively, in the future at an agreed-upon price.  Gold and silver futures contracts were traded on COMEX, and platinum and palladium futures contracts were traded on NYMEX, both using the Globex system.

52.    Traders using Globex could place orders in the form of "bids" to buy or "offers" to sell one or more futures contracts at various prices, or "levels."

53.    Trading on Globex was conducted electronically using a visible "order book" that displayed quantities of anonymous orders (*i.e.*, offers to sell futures contracts and bids to buy futures contracts).

54.    An order was "filled" or "executed" when a buyer's bid price and a seller's offer price for a particular contract matched.

55.    An "iceberg" order was a type of order that traders could place when trading precious metals futures contracts on COMEX and NYMEX.  In an iceberg order, the total amount of the order was divided into a visible portion of a certain pre-set quantity that was visible to other market participants, and a portion of the order (*i.e.*, the remainder of the order) that was not. Whenever the visible portion of the order was filled, the same, pre-set quantity of the remaining, hidden portion automatically became visible; this process repeated until the entire remainder of the order was either executed or canceled.

### The Conspiracy and Scheme to Defraud Precious Metals Market Participants

56.    During the Relevant Commodities Fraud Period, Deutsche Bank AG, through its employees and agents, including Vorley, Chanu, Liew, Bases, and Trader 1 (collectively, the "Subject Traders"), knowingly and willfully conspired and schemed to deceive other precious metals market participants by creating and communicating materially false and misleading information regarding supply or demand, in order to induce such other market participants into trading precious metals futures contracts at prices, quantities, and times that they would not have otherwise, in order to make money and avoid losses for the Company and the Subject Traders.

57.     In furtherance of the conspiracy, on many occasions during the Relevant Commodities Fraud Period, the Subject Traders placed one or more visible orders for precious metals futures contracts on one side of the market that, at the time they placed the orders, they intended to cancel before execution (the "Fraudulent Orders") in order to deceive other traders.

58.     By placing the Fraudulent Orders, the Subject Traders intended to create and communicate false and misleading information regarding supply or demand (*i.e.*, orders they did not intend to execute) in order to deceive other traders.

59.     It was further part of the conspiracy that this false and misleading information caused other traders to buy or to sell futures contracts at prices, quantities, and times that they otherwise would not have because, among other things, such traders reacted to the false and misleading increase in supply or demand.

60.     The Subject Traders placed Fraudulent Orders to buy, which created the false and misleading impression in the market of increased demand, which was intended to manipulate and move commodity futures prices upward.

61.     In addition, the Subject Traders placed Fraudulent Orders to sell, which created the false and misleading impression in the market of increased supply, which was intended to manipulate and move commodity futures prices downward.

62.     The Subject Traders placed orders at a lower visible quantity, often in the form of iceberg orders, on the opposite side of the market, that they intended to execute (the "Primary Orders").

63.     The Subject Traders placed Fraudulent Orders with the intent to artificially manipulate and move the prevailing price in a manner that would increase the likelihood that one or more of their Primary Orders would be filled.

18

64.     The Fraudulent Orders placed by the Subject Traders were material misrepresentations that falsely and fraudulently represented to traders that the Subject Traders were intending to trade the Fraudulent Orders when, in fact, they were not because, at the time the Fraudulent Orders were placed, the Subject Traders intended to cancel them before execution.

65.     The Subject Traders engaged in this false, misleading, and deceptive practice both by themselves and in coordination with each other and with other traders employed at Deutsche Bank AG, all in furtherance of the conspiracy.  When placing Fraudulent Orders by themselves, the Subject Traders would place their Fraudulent Orders individually in order to facilitate the execution of their own Primary Orders, without the placement of a Fraudulent Order by another trader.  By contrast, coordinated placement of the Fraudulent Orders involved one or more additional traders.  When engaging in coordinated placement of Fraudulent Orders, one of the Subject Traders, or another trader at Deutsche Bank AG, would place one or more Fraudulent Orders on one side of the market in order to facilitate the execution of Primary Orders placed on the opposite side of the market by another of the Subject Traders, or another trader at Deutsche Bank AG.

66.     The Subject Traders intended to, attempted to, and often did cancel the Fraudulent Orders before any part of the Fraudulent Orders were executed.

67.     The Fraudulent Orders placed by the Subject Traders exposed Deutsche Bank AG to (i) new and increased risks of loss, including in the form of: (a) fees, costs, and expenses incurred through investigations, litigation, and proceedings arising from the underlying conduct; (b) losses associated with the financial risk that the Fraudulent Orders would be executed (despite the traders' intent to cancel the Fraudulent Orders before execution); and (c) reputational harm; and (ii) actual loss, including: (a) the payment by Deutsche Bank AG of a $30,000,000 civil

19

monetary penalty to the CFTC on or around January 29, 2018, and (b) fees, costs, and expenses actually incurred through investigations, litigation, and proceedings arising from the underlying conduct.

68.     In submitting the Fraudulent Orders and Primary Orders in furtherance of their scheme, the Subject Traders transmitted and caused to be transmitted, wire communications from outside the United States into and through United States, as well as interstate wire communications, including certain wire communications that passed through the Eastern District of New York.

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Deutsche Bank Aktiengesellschaft (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and Money Laundering and Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Eastern District of New York (collectively the "Offices") regarding issues arising in relation to a conspiracy to fail to devise and maintain a sufficient system of internal accounting controls in connection with its Business Development Consultants ("BDC") program, and to falsify books, records, and accounts related to improper payments to such BDCs, and regarding issues relating to a conspiracy to engage in unlawful commodities trading; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Offices; and

WHEREAS, the Company's General Counsel – Americas and Global Head of Litigation and Regulatory Enforcement of the Company, Joe Salama, together with outside counsel for the Company, have advised the Management Board of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Management Board has RESOLVED that:

1.	The Company (a) acknowledges the filing of the two-count Information charging the Company with:  (1) one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate:  (a) the books and records provisions of the Foreign Corrupt Practices Act ("FCPA"), as amended, Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a); and (b) the internal controls provisions of

the FCPA, as amended, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and 78ff(a); and (2) one count of conspiracy to commit wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1349; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Offices; and (c) agrees to accept a criminal monetary penalty against Company totaling $85,186,206, and to pay a Victim Compensation Amount of $1,223,738 as well as a Criminal Disgorgement Amount of $681,480 (all totaling $87,091,424), and to pay such amounts with respect to the conduct described in the Information according to instructions provided by the Offices.

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      Member of the Management Board, Chief Administrative Officer, Stefan Simon; Member of the Management Board, CEO Americas, Christiana Riley; the General Counsel of the Company, Karen Kuder; General Counsel – Americas and Global Head of Litigation and Regulatory Enforcement of the Company, Joe Salama; and Head of Litigation and Regulatory

Enforcement – Americas, Andrew Stemmer are hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Management Board at this meeting with such changes as the Member of the Management Board, Chief Administrative Officer, Stefan Simon; Member of the Management Board, CEO Americas, Christiana Riley; the General Counsel of the Company, Karen Kuder; General Counsel – Americas and Global Head of Litigation and Regulatory Enforcement of the Company, Joe Salama; and Head of Litigation and Regulatory Enforcement – Americas, Andrew Stemmer, may approve;

4.      The Member of the Management Board, Chief Administrative Officer, Stefan Simon; Member of the Management Board, CEO Americas, Christiana Riley; the General Counsel of the Company, Karen Kuder; General Counsel – Americas and Global Head of Litigation and Regulatory Enforcement of the Company, Joe Salama; and Head of Litigation and Regulatory Enforcement – Americas, Andrew Stemmer, are hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Member of the Management Board, Chief Administrative Officer, Stefan Simon; Member of the Management Board, CEO Americas, Christiana Riley; the General Counsel of the Company, Karen Kuder; General Counsel – Americas and Global Head of Litigation and Regulatory Enforcement of the Company, Joe Salama; and Head of Litigation and Regulatory Enforcement – Americas, Andrew Stemmer, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption

of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on

behalf of the Company.

Date: _18 DEC 2020_

By: _____

Corporate Secretary
Deutsche Bank Aktiengesellschaft

**ATTACHMENT C**
**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, Deutsche Bank Aktiengesellschaft (the "Company"), on behalf of itself and its subsidiaries and affiliates, agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt new, or to modify its existing compliance programs, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance codes, and demonstrate rigorous adherence by example.   The Company will also ensure that middle management, in turn, require employees and agents to abide

by them.  The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the company.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws"), which policy shall be memorialized in a written compliance code or codes.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including, but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

    a.      gifts;

    b.      hospitality, entertainment, and expenses;

    c.      customer travel;

d.      political contributions;

e.      charitable donations and sponsorships;

f.      facilitation payments; and

g.      solicitation and extortion.

4.      The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system shall be designed to provide reasonable assurances that:

a.      transactions are executed in accordance with management's general or specific authorization;

b.      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

c.      access to assets is permitted only in accordance with management's general or specific authorization; and

d.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors

of operation, potential clients and business partners, use of third parties, gifts, travel and entertainment expenses, charitable and political donations, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Management Board, or any appropriate committee of the Management Board, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.      The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales,

legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.      The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures. The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and imposing appropriate discipline.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees.   Such procedures should be applied consistently, fairly and in a manner commensurate with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.      informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.      seeking a reciprocal commitment from agents and business partners.  The Company will understand and record the business rationale for using a third party in a transaction, and will conduct adequate due diligence with respect to the risks posed by a third-party partner such as a third-party partner's reputations and relationships, if any, with foreign officials.  The Company will ensure that contract terms with third parties specifically describe the services to be performed, that the third party is actually performing the described work, and that its compensation is commensurate with the work being provided in that industry and geographical region.  The Company will engage in ongoing monitoring of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books, records, and accounts of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

         a.     train the directors, officers, employees, agents, and business partners consistent with Paragraphs 18 and 19 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

         b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring, Testing, and Remediation*

18.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its anti-corruption compliance codes, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption codes, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.   The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.   Based on such review and testing and its analysis of any

prior misconduct, when misconduct is identified, the Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

**ATTACHMENT D**

**REPORTING REQUIREMENTS**

Deutsche Bank Aktiengesellschaft (the "Company") agrees that it will report to the Offices periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment C.  During this three-year period, the Company shall: (1) conduct an initial review and submit a report, and (2) conduct and prepare at least two (2) follow-up reviews and reports, as described below:

a.      By no later than one year from the date this Agreement is executed, the Company shall complete an initial review and submit to the Offices a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the Company's internal controls, policies, and procedures for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the proposed scope of the subsequent reviews (the "first report").

b.      The Company shall undertake at least two follow-up reviews, incorporating the Offices' views on the Company's prior reviews and reports, to further monitor and assess whether the Company's policies and procedures are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws.

c.      The initial review and the first report shall be submitted by no later than one year after this Agreement is executed.  The first follow-up review shall be completed and the second report shall be submitted to the Offices by no later than one year after the submission of

the first report.  The second follow-up review shall be completed and the third report shall be submitted to the Offices by no later than thirty days before the end of the Term.

        d.      The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

        e.      The reports shall be transmitted to Chief - FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue NW, Washington, DC 20530; Chief – Bank Integrity Unit, Money Laundering and Asset Recovery Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue NW, Washington, DC 20530; and Chief, Business and Securities Fraud Section, United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201.  The Company may extend the time period for submission of any of the reports with prior written approval of the Offices.

**ATTACHMENT E**

**CERTIFICATION**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention: Chief, FCPA Unit
        Attention: Chief, MIMF Unit

        United States Department of Justice
        Criminal Division, Money Laundering and Asset Recovery Section
        Attention:  Chief, Bank Integrity Unit

        United States Attorney's Office
        Eastern District of New York
        Attention: Chief, Criminal Division


Re:     Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 27 of the Deferred Prosecution Agreement ("DPA") filed on January 8, 2021 in the U.S. District Court for the Eastern District of New York, by and between the Offices and Deutsche Bank Aktiengesellschaft (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 6 of the DPA and that the Company has disclosed to the Offices any and all evidence or allegations of conduct required pursuant to Paragraph 6 of the DPA, which includes evidence or allegations that may constitute a violation of the FCPA anti-bribery provisions or accounting provisions had the conduct occurred within the jurisdiction of the United States ("Disclosable Information").  This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the DPA and the Office's determination whether the Company has satisfied its obligations under the DPA.

The undersigned hereby certify respectively that he/she is the Chief Executive Officer ("CEO") of the Company and that he/she is the Chief Financial Officer ("CFO") of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Eastern District of New York.  This Certification shall also constitute a

record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Eastern District of New York.


By: _____          Dated: _____
     [NAME]
     CEO
     Deutsche Bank Aktiengesellschaft

By: _____          Dated: _____
     [NAME]
     CFO
     Deutsche Bank Aktiengesellschaft